## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LISA BREEN,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 22-3688** |
| | : | |
| **RELIANCE STANDARD LIFE INS.** | : | |
| **CO.,** | : | |
| *Defendant.* | : | |

## <u>MEMORANDUM</u>

**KENNEY, J.**                                                    **October 2, 2023**

     Plaintiff Lisa Breen ("Plaintiff") brings this Employee Retirement Security Act ("ERISA")

denial-of-benefits claim against Defendant Reliance Standard Life Insurance Company

("Defendant"). Before the Court are cross-motions for summary judgment, which have both been

fully briefed. For the reasons set forth below, Defendant's Motion (ECF No. 22) will be granted

and Plaintiff's Motion (ECF No. 21) will be denied. An appropriate Order will follow.

## I.    <u>BACKGROUND</u>[1]

### A.    **Relevant Plan Terms**

     Plaintiff was employed as a registered nurse by Abington Health. ECF No. 23 ¶ 1. Through

this employment, Plaintiff was a participant in Abington Health's employee benefits plan. *Id.* ¶ 2.

Defendant insures the long-term disability ("LTD") benefits under Abington Health's LTD policy.

*Id.* ¶ 3. Under this policy, disability is defined as follows:

> CLASS 2, 3 & 4: "Totally Disabled" and "Total Disability" mean,
> that as a result of an Injury or Sickness: during the Elimination

---

[1]    The following facts are gleaned from: (1) the parties' Joint Statement of Facts (ECF No. 23); (2) Plaintiff's Statement of Additional Facts (ECF No. 21-2) and Defendant's Response to those facts (ECF No. 28); and (3) Defendant's Statement of Facts in Support of its Motion for Summary Judgment (ECF No. 22-1), and Plaintiff's Response to those facts (ECF No. 27). All facts are undisputed unless otherwise noted.

> Period and for the first 24 months for which a Monthly Benefit is
> payable, an Insured cannot perform the material duties of his/her
> Regular Occupation;
>
> "Partially Disabled" and "Partial Disability" mean that as a result of
> an Injury or Sickness an Insured is capable of performing the
> material duties of his/her Regular Occupation on a part-time basis
> or some of the material duties on a full-time basis. An Insured who
> is Partially Disabled will be considered Totally Disabled, except
> during the Elimination Period;
>
> "Residual Disability" means being Partially Disabled during the
> Elimination Period. Residual Disability will be considered Total
> Disability; and after a Monthly Benefit has been paid for 24 months,
> an Insured cannot perform the material duties of Any Occupation.
> We consider the Insured Totally Disabled if due to an Injury or
> Sickness he or she is capable of only performing the material duties
> on a part-time basis or part of the material duties on a full-time basis.
>
> If an Insured is employed by you and requires a license for such
> occupation, the loss of such license for any reason does not in and
> of itself constitute "Total Disability."

*Id.* ¶ 4. Under the policy, Any Occupation means: "an occupation normally performed in the national economy for which an Insured is reasonably suited based upon his/her training, education, or experience." *Id.* ¶ 5.

Additionally, the policy states that Defendant "shall serve as the claims review fiduciary with respect to the insurance policy and the Plan" and Defendant "has the discretionary authority to interpret the Plan and the Insurance policy and to determine eligibility for benefits." ECF No. 22-1 ¶ 57; ECF No. 27 ¶ 57.

## B.    Factual Background

In 2004, Plaintiff began working at Abington Health as a registered nurse, a job classified as a "Medium job with essential requirements of Balancing, Climbing, Crawling, Crouching,

Kneeling, Reaching, Performing Repetitive Motions, Standing, Stooping, and Walking." AR 924.[2]

On July 6, 2018, Plaintiff was approved by the Social Security Administration for disability

benefits pursuant to the Administration's rules. ECF No. 23 ¶ 10. Three days later, on July 9, 2018,

Plaintiff stopped working due to her medical conditions, including focal epilepsy. *Id.* ¶ 7. Records

from Dr. Kartik Sivaraaman, neurologist, from September 13, 2018, show that Plaintiff had been

started on the medication Keppra for deja vu spells (a symptom of focal epilepsy), but that Plaintiff

had difficulty tolerating the medication. AR 395–396.

### 1.   Regular Occupation Period

On January 24, 2019, Defendant received Plaintiff's application for LTD benefits. ECF

No. 23 ¶ 8. Upon a review of Plaintiff's medical records, a member of Defendant's clinical staff

concluded:

> [b]ased on the available information, [Plaintiff] lacks work capacity
> at the date of loss due to tunnel vision, dizziness, episodes of déjà
> vu attributed to focal epilepsy. By September 2018 focal epilepsy
> episodes have resolved but there is increasing fatigue and
> somnolence requiring medication adjustment and sleep medicine
> work up. . . . Mild obstructive sleep apnea is also noted and
> resolution of sleepiness would be anticipated after a few weeks of
> regular treatment. It would appear by March 2019 [Plaintiff] would
> be capable to return to full work capacity.

ECF No. 22-1 ¶ 5; ECF No. 27 ¶ 5. Based on this review, Defendant approved Plaintiff's Regular

Occupation LTD claim on April 4, 2019. ECF No. 22-1 ¶ 6; ECF No. 27 ¶ 6.

Periodically, Defendant requested updated medical records to confirm continued eligibility

benefits. ECF No. 22-1 ¶ 7; ECF No. 27 ¶ 7. Upon a review of the records available in April 2019,

a member of Defendant's clinical staff concluded that because of "safety concerns with pre-focal

---

[2]      All "AR" references are to the pages of the Administrative Record submitted with the
parties' Joint Statement of Facts. ECF No. 23.

seizure episodes, it is reasonable [Plaintiff] is unable to perform patient care tasks at this time and ongoing." ECF No. 22-1 ¶ 8; ECF No. 27 ¶ 8. This member of Defendant's clinical staff recommended allowing Plaintiff "an additional 2 months to see a provider for treatment of her seizures and updated R&Ls. Beyond that, it would be difficult to assess ongoing impairment." ECF No. 22-1 ¶ 8; ECF No. 27 ¶ 8.

Records from October 3, 2019 from Dr. Kandan Kulandaivel, Plaintiff's treating neurologist at that time, indicate that Plaintiff had undergone an EEG which showed normal activity. AR 743. Dr. Kulandaivel's notes further state, "[a]t this point, we [are still] managing her for probable seizures. This situation makes her safety very important, as well. If she has an episode during work as an RN she may be at risk for injuring the patient inadvertently." AR 743.

On October 28, 2019, a member of Defendant's clinical staff reviewed Plaintiff's claim and concluded based on the available information that "work up has revealed no evidence of seizure activity. [Plaintiff] has reported spells of unclear cause. Overall, while information suggests the presence of spells, EEG revealed normal activity and last event in May 2019 was thought to be gastritis versus biliary colic. By 9/20/21 symptoms do not appear of a quality or severity that would prevent work capacity." ECF No. 22-1 ¶ 9; ECF No. 27 ¶ 9. Therefore, on October 29, 2019, Defendant discontinued Plaintiff's benefits beyond November 5, 2019. ECF No. 22-1 ¶ 10; ECF No. 27 ¶ 10.

Plaintiff appealed from Defendant's decision to discontinue benefits beyond November 5, 2019. ECF No. 22-1 ¶ 11; ECF No. 27 ¶ 11. In support of her appeal, Dr. Kulandaivel submitted a letter on November 15, 2019. AR 751–752. Dr. Kulandaivel indicated that Plaintiff continued to report having deja vu spells even while taking Keppra and was complaining of side effects of medications. *Id.* He also noted that "[e]ven though these spells are episodic, they are highly

unpredictable and when they happen, they leave her tired and with mental fogginess." AR 752. He further explained that in an attempt to capture and classify Plaintiff's diagnosis, Plaintiff was admitted to the hospital for three days during which time her seizure medication was stopped, but unfortunately Plaintiff did not have any episodes during this time and thus, the study was inconclusive. *Id.* As this study was inconclusive, Dr. Kulandaivel noted "we decided that she might benefit from a further study in a tertiary epilepsy center like Jefferson [and Plaintiff] has an upcoming appointment on January 8 where she will be evaluated." *Id.*

After receiving Plaintiff's appeal, Defendant utilized the services of a third-party vendor to engage an independent physician to perform a medical peer review. ECF No. 22-1 ¶ 12; ECF No. 27 ¶ 12. Accordingly, Dr. Zeyad Morcos, a Board-Certified Neurologist, reviewed Plaintiff's file and issued a report on January 3, 2020. ECF No. 22-1 ¶ 13; ECF No. 27 ¶ 13. Dr. Morcos' Report explained that "[b]ased on [his] review of the totality of information submitted, there is no conclusive evidence to clinically identify or substantiate the complaints and conditions which impacted the claimant as of September 20, 2019." ECF No. 22-1 ¶ 14; ECF No. 27 ¶ 14. Dr. Morcos noted, however, "this [is] not unheard of, this is not uncommon, upon working up spells and suspecting partial epilepsy." *Id.* Dr. Morcos concluded that Plaintiff has a good prognosis, and "is having several tests to help determine the etiology of the spells [and if they did prove] partial epilepsy, there are several available antiepileptic drugs that are helpful." ECF No. 22-1 ¶ 15; ECF No. 27 ¶ 15. Dr. Morcos further opined in this report that Plaintiff "had work capacity on [a] full-time and consistent basis as of September 20, 2019 on light duty." ECF No. 22-1 ¶ 16; ECF No. 27 ¶ 16. As Plaintiff's regular occupation contained "medium" exertion requirements—i.e., exceeding the recommended light exertion capabilities found by Dr. Morcos—on January 7, 2020,

Defendant reversed the denial of Regular Occupation benefits and paid the claim for the duration of the Regular Occupation period. ECF No. 22-1 ¶¶ 17–18; ECF No. 27 ¶¶ 17–18.

The next day, January 8, 2020, Plaintiff underwent an EEG for evaluation of seizures, which identified "occasional left anterior to midtemporal delta slowing." AR 799–800. Specifically, the diagnostic report stated that "[t]his EEG shows left anterio[r] to midtemporal cerebral dysfunction, which is non-specific with regard to etiology" and "no epileptiform discharges were seen." *Id.* Dr. Christopher Skidmore, Plaintiff's treating neurologist, also evaluated Plaintiff following this EEG and indicated that "[b]ased on the history provided it appears [Plaintiff] has post-traumatic epilepsy with focal aware seizures. It is unclear to what degree her level of awareness is impaired." AR 806. Dr. Skidmore further noted that he believed "an EMU admission is warranted to help confirm her diagnosis. However another empiric AED trial would also be a reasonable choice." *Id.*

### 2.    Any Occupation Period

Under the terms of the policy, the Regular Occupation period ended on January 5, 2021 and in order to receive benefits after two years, Plaintiff was required to prove that she was incapable of performing the material duties of "Any Occupation" for which she was qualified by education, training, or experience. ECF No. 22-1 ¶ 19; ECF No. 27 ¶ 19; ECF No. 23 ¶¶ 4, 5. Per this policy, on June 5, 2020, Defendant informed Plaintiff that it would begin its review into whether Plaintiff met the definition of disability under the Any Occupation standard. ECF No. 23 ¶ 11.

The Administrative Record contains only three treatment records which were generated in the eight months prior to the start of the Any Occupation Period. ECF No. 22-1 ¶ 20; ECF No. 27 ¶ 20. These records were dated April 8, 2020, September 2, 2020, and November 24, 2020. *Id.*

After these records, there is no other record of treatment until July 7, 2021. *Id.* Moreover, following the July 7, 2021 treatment record, the Administrative Record contains only two more treatment records—one occurring on August 20, 2021, and the other occurring on October 5, 2021. ECF No. 22-1 ¶¶ 39, 41; ECF No. 27 ¶¶ 39, 41; *see also* ECF No. 22-2 at 14 (citations omitted).

The first treatment record is from a telemedicine visit with Dr. Skidmore on April 8, 2020. ECF No. 22-1 ¶ 21; ECF No. 27 ¶ 21. Dr. Skidmore's notes indicate that he adjusted Plaintiff's medications and discussed strategies to help remind her about her dosing. ECF No. 22-1 ¶ 22; ECF No. 27 ¶ 22. Dr. Skidmore's examination contained normal findings and he instructed Plaintiff to follow up with his office in three months but told Plaintiff to contact him sooner if she had a seizure. ECF No. 22-1 ¶¶ 24–25; ECF No. 27 ¶¶ 24–25. The Administrative Record does not contain any information indicating that Plaintiff contacted Dr. Skidmore about any additional seizures prior to her next visit. ECF No. 22-1 ¶ 26; ECF No. 27 ¶ 26.

The next treatment record is from a telemedicine visit with Dr. Skidmore on September 2, 2020.[3] ECF No. 22-1 ¶ 28; ECF No. 27 ¶ 28. Dr. Skidmore's records from this visit indicate that Plaintiff "had 4 seizures since her last visit in April with the last seizure being Aug. 9." *Id.* Dr. Skidmore indicates that the duration of these seizures is "1-2 minutes" and Plaintiff "is able to sit herself down and wait for the symptoms to remit. She does not los[e] awareness, but prefers not to interact during the spell. Post-ictally she feels sever[e] fatigue and has to go to sleep for several hours." ECF No. 22-1 ¶¶ 29–30; ECF No. 27 ¶¶ 29–30. Dr. Skidmore also noted that Plaintiff "continues to complain of cognitive dysfunction and [he] recommended formal neuropsychological testing to objectively determine what her deficits are." AR 827. There were

---

[3]     Defendant refers to this visit as occurring on September 13, 2020 at various points. The Administrative Record shows that the visit was on September 2, 2020, but Dr. Skidmore electronically signed the record on September 13, 2020. *See* AR 1026–1029.

no follow up instructions contained in the notes from this visit. ECF No. 22-1 ¶ 32; ECF No. 27 ¶ 32.

On September 16, 2020, Alison House, RN, BSN, CCM, reviewed Plaintiff's file and concluded "[b]ased on medical records reviewed, [Plaintiff] appears capable of sustained full-time sedentary work function ongoing." ECF No. 23 ¶ 13. She further stated that although Plaintiff "may have some complaints consistent with symptoms of seizure disorder, the file does not contain severity of findings consistent with those that would cause functional impairments sufficient to preclude work activity due to the reported symptoms." *Id.* In other words, Plaintiff's "physical examinations, testing, and subspeciality evaluations have not documented findings such as, but not limited to, frequency and severity of seizures episodes, EEG testing, brain imaging studies, inadequate response to agents, or medication side effects that could potentially physically impact the [Plaintiff's] ability to work during the period in question." *Id.*

On September 17, 2020, Matthew Bolks, MS, CRC, a Senior Vocational Rehabilitation Specialist employed by Defendant performed a Residual Employability Analysis. ECF No. 22-1 ¶ 33; ECF No. 27 ¶ 33. Mr. Bolks considered whether there were any alternative occupations reasonably suited based on Plaintiff's education, training or experience, as well as her physical capabilities. AR 813–815. Mr. Bolks found that "[b]ased on [the] medical records reviewed, [Plaintiff] appears capable of sustained full-time sedentary work function ongoing." AR 813. He also considered that Plaintiff is a Registered Nurse with an Associates Degree in Nursing with a Geriatric certification. *Id.* Mr. Bolks found it was likely that as a Registered Nurse, Plaintiff would have acquired skills and abilities, such as: (i) the ability to "[a]pply technical knowledge, common sense and special medical skills to care for or treat sick or disabled people"; (ii) to "[i]nstruct, plan, and oversee the work of others"; (iii) to "[k]eep accurate records"; (iv) to "[i]nspire trust through

8

tact, composure, and manner"; and (v) to "[a]dapt quickly to emergency situations." *Id.* Accordingly, Mr. Bolks concluded that Plaintiff "has transferable skills" and identified "a representative list of occupational alternatives in light of [Plaintiff's] physical restrictions and limitations and in consideration of her educational background and vocational history." AR 814. Specifically, Mr. Bolks identified the following alternative sedentary occupations: (i) Utilization Review Coordinator; (ii) Cardiac Monitor Technician, (iii) Registrar, Nurses' Registry; (iv) Hospital-Admitting Clerk; (v) Telephone Triage Nurse; and (vi) Rehabilitation Case Manager. *Id.*

On September 28, 2020, Defendant informed Plaintiff that it had determined Plaintiff would no longer meet the definition of disability under the "Any Occupation" standard as of January 5, 2021. ECF No. 23 ¶ 14. Specifically, Defendant informed Plaintiff: "Based on medical records reviewed, you appear capable of sustained full time sedentary work function ongoing, while you have some complaints consistent with symptoms of seizure disorder, the file does not contain severity of findings consistent with those that would render you unable to perform full time sedentary work activities." *Id.* ¶ 15. Defendant further explained: "Your physical examinations, testing, and subspecialty evaluations have not documented findings such as, but not limited to, frequency and severity of seizure episodes, EEG testing, brain imaging studies, inadequate response to agents, or medication side effects that could potentially physically impact your ability to work." *Id.* Defendant also stated that its vocational staff had reviewed Plaintiff's claim and identified several occupations it determined Plaintiff could perform, including Utilization Review Coordinator, Cardiac Monitor Technician, Registrar, Nurses' Registry, Hospital Admitting Clerk, Telephone Triage Nurse, and Rehabilitation Case Manager. *Id.* ¶ 16.

On November 24, 2020, Dr. Skidmore had a telephone session with Plaintiff, and his notes indicate that Plaintiff was continuing to "have seizures, and had increased cognitive side effects."

AR 829. The notes further indicated that Plaintiff "is scheduled to have neuropsychological testing on 11/30" and that she would contact Dr. Skidmore "in January to start a new medication." *Id.*

By way of letter dated June 29, 2021 Plaintiff informed Defendant that she was represented by counsel. ECF No. 23 ¶ 19. Thereafter, on July 2, 2021, Defendant informed Plaintiff that her deadline to appeal was extended due to COVID-19 until March 28, 2022. *Id.* ¶ 20.

Plaintiff's next treatment record is from July 7, 2021, when she was evaluated in person, by Kelly Pearson-Caravetta, CRNP, under the supervision of Dr. Skidmore. ECF No. 22-1 ¶ 35; ECF No. 27 ¶ 35. The treatment notes indicate Plaintiff "[c]ontinues with focal aware seizures[, at a rate of] two per month." AR 1039. Dr. Skidmore also added: "Persistent seizures and cognitive complaints. She has a normal language exam in the office. I agree with the need to trial a new AED. She is also willing to have the neuropsychological testing and sleep consult now. This will help us better understand her overall neurological complaints." *Id.*

On August 20, 2021, Plaintiff had a telemedicine visit with Dr. Ritu Grewal for obstructive sleep apnea. ECF No. 22-1 ¶ 39; ECF No. 27 ¶ 39. Dr. Grewal's notes from this visit indicate Plaintiff has "[m]ild obstructive sleep apnea with strong positional component. Patient has been intolerant to CPAP in the past. I discussed oral appliance therapy as well as using a positional device for nonsupine sleep. . . . I will order a repeat home sleep test to be done while she is using a positional device. I will call her with the results. She will then follow-up with me in a couple of months." ECF No. 22-1 ¶ 40; ECF No. 27 ¶ 40. Dr. Grewal further noted Plaintiff "has excessive daytime sleepiness that has been present for many years. It appears to have become worse since she was started on Keppra. I am concerned that her daytime sleepiness is out of proportion to the degree of sleep apnea. If she continues to be sleepy after controlling for the obstructive sleep apnea

component she will be evaluated for idiopathic hypersomnia/narcolepsy. Driving precautions were discussed with her." ECF No. 23 ¶ 22.

On October 5, 2021, Plaintiff saw Dr. Grewal again—which is the last treatment record available. ECF No. 22-1 ¶ 41; ECF No. 27 ¶ 41. The treatment notes indicate that Plaintiff "underwent 1 night of unattended home sleep diagnostic polysomnography for the assessment of obstructive sleep apnea." *Id.* Dr. Grewal indicated that the "data do support the diagnosis of mild obstructive sleep apnea as respiratory event index was 5.6" and noted that "[h]ome sleep tests may underestimate the severity of sleep apnea." *Id.* Dr. Grewal recommended Plaintiff "[c]ontinue using [a] positional device" and "[f]ollow up at the Jefferson sleep disorders center as needed." *Id.*

On March 24, 2022, Plaintiff timely appealed Defendant's denial of her claim. ECF No. 23 ¶ 21. Plaintiff submitted eight exhibits with this appeal, including the medical records just described, a medical opinion form from her treating neurologist Dr. Skidmore, an episode log completed by Plaintiff, a Sworn Declaration, and a Vocational Review. *Id.*

Dr. Skidmore's medical opinion form stated that Plaintiff "has focal epilepsy and her seizures and medication result in cognitive dysfunction. Formal neuropsychological testing is pending." AR 920. Dr. Skidmore further stated that Plaintiff has two seizures per month that last one to two minutes and from which it takes her four hours to recover. ECF No. 22-1 ¶ 43; ECF No. 27 ¶ 43. Dr. Skidmore's opinion indicated that Plaintiff has "a reasonable medical need to be absent from a full time work schedule on a chronic basis," meaning that Plaintiff requires "more than 4 absences during any month's period attributable to the medical condition(s), including absences for required medical treatment, such as doctor's appointments, diagnostic testing, treatment etc." AR 921. Dr. Skidmore estimated that five absences could be reasonably medically expected in any month. *Id.*

Plaintiff's episode log reflected that she had thirteen episodes or headaches between May 6, 2021 and December 29, 2021. ECF No. 21-2 ¶ 9; ECF No. 28 ¶ 9. Additionally, Plaintiff's Sworn Declaration stated, *inter alia*, "[w]hen I have an episode, I suddenly feel like I am on a sedative; I am zoned out, unable to interact with others the way that I should. After that, I need to lay down for a few hours to recover." ECF No. 21-2 ¶ 11; ECF No. 28 ¶ 11. Plaintiff also noted in this Declaration: "My neurologist and I have talked about whether I could go back to work, but I don't think I could because of how unpredictable my seizure episodes are." AR 1074.

Plaintiff also submitted a December 20, 2021 Vocational Review, in which Wallace Stanfill, M.Ed., L.P.C. opined that Plaintiff had been "totally disabled from her past employment as a Registered Nurse or from any other occupation for which she is reasonably trained and qualified since her focal seizures first occurred in 2019 through the present date." ECF No. 22-1 ¶ 45; ECF No. 27 ¶ 45; *see also* AR 928. Mr. Stanfill's review also stated that Plaintiff's "medical condition and less than sedentary work tolerance, as described by her treating neurologist, make a return to work in any capacity in the foreseeable future vocationally improbable." AR 928. "Specifically, [Plaintiff's] medical inability to regularly attend any job for eight hours per day, five days per week due to the frequency of her seizures and required recovery period, need to take frequent and unpredictable breaks from work to rest, and her repeated lapses in concentration which would not allow for even unskilled operation on a sustained basis, each in and of itself, and combined, preclude any competitive employment." *Id.* Mr. Stanfill further opined that "the residual employability analysis report relied upon by [Defendant] in denying [Plaintiff's] disability benefits is flawed in that it incorrectly identified alternative sedentary skilled to semi-skilled employment in occupations that require experience and credentials outside of [Plaintiff's] acquired skillset." *Id.*

Defendant hired James W. Pearce, M.D., an outside neurologist, to perform a medical review. ECF No. 23 ¶ 23. As part of his review of Plaintiff's claim, Dr. Pearce tried to contact Dr. Skidmore multiple times, but Dr. Skidmore did not return his calls. ECF No. 22-1 ¶ 48; ECF No. 27 ¶ 48. Dr. Pearce opined that based on his review of the medical records, "the medical information did not support limitations sufficient to preclude working from January 5, 2021 to present. Although a diagnosis of partial epilepsy was considered and the claimant was treated with medications, a detailed repeated testing did not support this diagnosis." ECF No. 23 ¶ 23. Dr. Pearce concluded that "from a neurologic standpoint impairment restrictions and limitations were not supported [as] the [Plaintiff] is able to do all activities constantly 8 hours a day 5 days a week." ECF No. 22-1 ¶ 52; ECF No. 27 ¶ 52.

In response to Dr. Pearce's report, Plaintiff provided a response from Dr. Skidmore, where Dr. Skidmore expressed his disagreement with Dr. Pearce. ECF No. 23 ¶ 26. Dr. Skidmore explained that Plaintiff "has focal epilepsy and is having seizures up to 3 times per month. Her EEG testing in the past was negative, but focal aware seizures are often missed on scalp EEG. . . . In addition, she has cognitive symptoms which have not been fully investigated due to the Covid pandemic. Negative EEG testing does not exclude a diagnosis of epilepsy." *Id.*

On June 21, 2022, Defendant sent Plaintiff a letter denying Plaintiff's appeal. *Id.* ¶ 27. Defendant specifically cited Dr. Pearce's addendum, which states that "Dr. [] Skidmore did not provide any new clinical information that would change my prior opinion. No new information was provided for review." *Id.* ¶ 28. Plaintiff initiated this lawsuit on September 15, 2022. *Id.* ¶ 29.

## II.   <u>PROCEDURAL HISTORY</u>

On September 15, 2022, Plaintiff filed this action for the purpose of obtaining relief form Defendant's refusal to pay LTD benefits under Abington's ERISA-employee benefit plan. ECF No. 1. On March 23, 2023, Plaintiff and Defendant filed cross-motions for summary judgment.

*See* ECF Nos. 21 (Plaintiff's Motion), 22 (Defendant's Motion). Both motions were fully briefed. *See* ECF Nos. 26 (Plaintiff's Opposition), 28 (Defendant's Opposition), 30 (Defendant's Reply), 31 (Plaintiff's Reply). This Court held oral argument on the motions on June 21, 2023. ECF No. 34. Accordingly, both motions are ripe for consideration.

## III.   **LEGAL STANDARD**

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Indeed, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *see also* Fed. R. Civ. P. 56(c).

The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. The non-movant opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

When determining the existence of a genuine issue of material fact, a court must "examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (citations omitted). The court need only decide whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

## IV.   DISCUSSION

### A.   ERISA Standard of Review

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber*

*Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan grants the administrator discretionary authority to determine eligibility for benefits, an arbitrary and capricious standard is to be used. *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844–845 (3d Cir. 2011).

Under *de novo* review, "[t]he administrator's decision is accorded no deference or presumption of correctness"; instead, the "court must review the record and determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413–14 (3d Cir. 2011) (internal quotations and citations omitted).

Under the arbitrary and capricious standard, also known as the abuse of discretion standard, courts "may overturn an administrator's decision only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Viera*, 642 F.3d at 413 (quoting *Miller*, 632 F.3d at 845); *see also Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 276 (3d Cir. 2021) (noting that the arbitrary-and-capricious and abuse-of-discretion standards of review are essentially identical in the ERISA context). "A decision is supported by substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision." *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000) (internal quotation marks and citation omitted). Accordingly, the scope of review under this standard "is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009) (internal quotation marks and citation omitted); *see also Cato v. Unum Life Ins. Co. of Am.*, No. 21-cv-10056, 2022 WL 3013085, at *8 (D.N.J. July 29, 2022) ("[D]eference should be given to the lion's share of ERISA claims." (citations omitted)).

Applying the arbitrary and capricious standard, courts "determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." *Rizzo v. First Reliance Standard Life Ins. Co.*, No. 20-1144, 2022 WL 17729430, at * 4 (3d Cir. Dec. 16, 2022) (quoting *Metropolitan Life Ins. v. Glenn*, 554 U.S. 105, 117 (2008)). "[S]uch factors may include: (1) the plan administrator's conflict in both administering claims and paying them, (2) failure to identify the rationale or all of the relevant diagnoses in the denial letter, (3) non-compliance with ERISA regulations, (4) failure to address all relevant diagnoses or an otherwise incomplete medical analysis by an examiner, and (5) unusual timing or behavior related to seeking medical evaluations." *Id.* (cleaned up) (internal quotation marks and citations omitted). "When reviewing an administrator's factual determinations, [courts] consider only the 'evidence that was before the administrator when he made the decision being reviewed.'" *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (citation omitted); *see also Noga*, 19 F.4th at 275 ("But an ERISA administrative record may not be supplemented with *post hoc* explanations for procedural irregularities."). "[P]laintiff carries the burden of demonstrating that . . . the administrator's decision was arbitrary and capricious." *Menes v. Chubb & Son*, 101 F. Supp. 3d 427, 434 (D.N.J. 2015) (citation omitted) (citation omitted).

Here, the parties disagree on the proper ERISA review standard to be applied with Defendant arguing the arbitrary and capricious standard of review applies and Plaintiff arguing *de novo* review is applicable. Both parties agree the policy grants Defendant discretion. ECF No. 22-1 ¶ 57; ECF No. 27 ¶ 57. However, Plaintiff asserts that Defendant failed to strictly adhere to the requirements in "the ERISA regulations by failing to explain its disagreement with the views presented by both the health care and vocational professionals who had evaluated" Plaintiff, and therefore, the proper standard of review is *de novo*. ECF No. 21-1 at 11.

However, the Third Circuit "has held that notice deficiencies and poor reasoning for the denial of a claim is a factor that can be appropriately considered under the arbitrary-and-capricious standard of review and does not necessitate altering the standard to *de novo* absent a 'severe procedural violation.'" *Lipani v. Cigna Health & Life Ins. Co.*, No. 21-cv-16851, 2023 WL 4237061, at *5 (D.N.J. June 28, 2023) (citing *inter alia Noga*, 19 F.4th at 276 (underscoring that "a fiduciary . . . need not maintain a procedurally immaculate claim file to avoid an abuse-of-discretion finding," and indicating that courts in the Third Circuit utilize a "combination-of-factors analysis"); *Becknell v. Severance Pay Plan of Johnson & Johnson & U.S. Affiliated Companies*, 644 F. App'x 205, 213 (3d Cir. 2016) (reviewing the approach of various Courts of Appeals and suggesting that "deference" should be accorded absent "a severe procedural violation.")). Here, there is no "severe" procedural violation. As noted *supra*, Plaintiff argues Defendant violated ERISA regulations by failing to include a thorough explanation as to why it disagreed with the views of the health care and vocational professionals who evaluated Plaintiff. ECF No. 21-1 at 11. However, Defendant's denial does specifically note that it considered the information. Defendant explained that Plaintiff's past EEG tests were negative and there were no additional tests to support the opinion of Dr. Skidmore, the treating neurologist. *See, e.g.*, AR 360. Moreover, as the vocational expert's opinion relies on Dr. Skidmore's unsubstantiated opinion, discrediting that report as well was not a severe procedural violation. ECF No. 28-1 at 22–24. Accordingly, Defendant's so-called "vague" explanation cannot be said to be a "severe" procedural violation; rather, if this Court were to find Defendant's explanation was "vague", such a classification would appropriately be categorized as merely "poor reasoning." Therefore, the Court finds that the arbitrary and capricious standard is the appropriate level of judicial review under the particular facts of this case.

### B.   Denial of Claim for Benefits[4]

Plaintiff argues that Defendant's "failure to provide a reasoned explanation for crediting a flawed reviewing opinion over [Plaintiff's] treating provider, failing to explain rejecting Dr. Skidmore's opinion, and the failure to provide any analysis of the vocational expert that evaluated [Plaintiff] are evidence of arbitrary and capricious behavior." ECF No. 21-1 at 13. In response, and in support of its motion for summary judgment, Defendant argues that its determination that Plaintiff failed to meet her burden of proving her disability was reasonable and supported by the medical evidence as Plaintiff is not only qualified but is also physically capable of working in several sedentary-type occupations. ECF No. 22-2 at 5. For the reasons described below, the Court finds after weighing all the case-specific factors that there is sufficient evidence for a reasonable person to agree with Defendant's decision and accordingly, Defendant's decision was not arbitrary and capricious.

### 1.   Physician Opinions and Plaintiff's Self-Reports

As described *supra*, it is the Plaintiff's burden to prove medical disability. In other words, "[i]t is not [Defendant's] burden to determine the existence of Plaintiff's disability; it is sufficient that [Defendant] determine, reasonably, that Plaintiff failed to satisfy [her] burden of proof." *Hocheiser v. Liberty Mut. Ins. Co.*, No. 17-cv-06096, 2021 WL 672660, at *17 (D.N.J. Feb. 22, 2021) ("*Hocheiser I*"), *aff'd*, No. 21-1533, 2023 WL 1267070 (3d Cir. Jan. 31, 2023) ("*Hocheiser II*"). Under the terms of the policy, following the two-year Regular Occupation Period, Plaintiff must furnish the requirement proof of Total Disability, that is, proof that the "Insured cannot perform the material duties of Any Occupation," meaning "an occupation normally performed in

---

[4]     Because this Court has extensively recited the record in the Background Section of this Memorandum and provided record citations, the Court will only cite to the record where necessary in this Section.

the national economy for which an Insured is reasonably suited based upon his/her training, education, or experience." ECF No. 23 ¶¶ 4–5. Courts have recognized that plaintiffs carry a heavy burden under this "Any Occupation" standard. *See, e.g.*, *Rodriquez v. Reliance Standard Life Ins. Co.*, No. 12-4810, 2014 WL 347884, at *3 (D.N.J. Jan. 31, 2014) ("Plaintiff's burden under the 'any occupation' standard is an especially heavy one." (citations omitted)), *aff'd*, 599 F. App'x 423 (3d Cir. 2015); *see also Matteo v. Reliance Standard Life Ins. Co.*, No. 18-11450, 2022 WL 819600, at *7 (D.N.J. Mar. 17, 2022) (same).

Additionally, in reviewing a claim for disability, "[a] plan administrator is not required to give greater weight to the opinions of a claimant's treating physicians than to those of independent medical examiners." *Balas v. PNC Fin. Servs. Grp., Inc.*, No. 2:10-cv-249, 2012 WL 681711, at *12 (W.D. Pa. Feb. 29, 2012); *see also Branca v. Liberty Life Assur. Co. of Boston*, No. 13-cv-740, 2014 WL 1340604, at *10 (E.D. Pa. Apr. 3, 2014) (noting administrator "had no obligation 'to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation why they credit reliable evidence that conflicts with the treating physician's opinion.'" (citation omitted)). "[T]he Third Circuit has held that the opinions of consulting physicians, even those who do not examine the patient, may constitute evidence sufficient to uphold a plan's denial of benefits under an arbitrary and capricious standard." *O'Connor v. PNC Fin. Serv. Grp.*, No. 15-5051, 2017 WL 5352721, at *6 (E.D. Pa. Nov. 13, 2017) (citations omitted). Additionally, a "'professional disagreement' between consulting physicians and treating providers 'does not amount to an arbitrary refusal to credit.'" *Id.* at *18 (citation omitted).

Here, as indicated *supra* in the Background Section, Defendant's September 28, 2020 denial letter indicated that Plaintiff's file did not contain findings of the severity to render Plaintiff

unable to perform full-time sedentary work activities. Specifically, the letter informed Plaintiff: "Your physical examinations, testing, and subspecialty evaluations have not documented findings such as, but not limited to, frequency and severity of seizures episodes, EEG testing, brain imaging studies, inadequate response to agents, or medication side effects that could potentially physically impact your ability to work." AR 338.

In appealing this denial, Plaintiff submitted two treating physician opinions—one from Dr. Kulandaivel from November 15, 2019 and one from Dr. Skidmore from November 4, 2021. But these opinions, when considered with the other records available, do not render Defendant's decision unreasonable. First, Dr. Kulandaivel's letter was prior to the Any Occupation period, and therefore, Dr. Kulandaivel never offered the opinion that Plaintiff was Totally Disabled from Any Occupation as of January 5, 2021. Additionally, Dr. Kulandaivel's letter, when describing Plaintiff's condition, references solely Plaintiff's self-reported episodes and Plaintiff's claimed symptoms. The letter explains that when Dr. Kulandaivel attempted to capture and classify an episode by admitting Plaintiff to the hospital for three days and stopping her seizure medication, Plaintiff did not have any episodes and the study was thus inconclusive. Dr. Kulandaivel's letter concluded that Plaintiff would benefit from a further study in a tertiary epilepsy center and explained that Plaintiff had an appointment on January 8, 2020 to be further evaluated.

The January 8, 2020 evaluation included an EEG, the report of which identified occasional left anterior to midtemporal delta slowing. On the same day of this EEG, Plaintiff was evaluated by Dr. Skidmore who upon review of the EEG indicated that it "is unclear to what degree [Plaintiff's] level of awareness is impaired." AR 121. Dr. Skidmore, although he did not observe any seizures, wrote in his January 8, 2020 notes that Plaintiff "has focal epilepsy and her seizures and medication result in cognitive dysfunction" and that "formal neuropsychological testing is

pending." AR 920. This EEG test and Dr. Skidmore's evaluation of the test does not prove the existence of a disabling condition. Particularly, instructive on this point is *Schlegel v. Life Ins. Co. of N. Am.*, 269 F. Supp. 2d 612 (E.D. Pa. 2003). *Schlegel* involved a claim of disability due to epileptic seizures, memory loss and other conditions supported by claimant's physicians; however, the court upheld defendant's denial of benefits finding plaintiff's strongest evidence, an EEG documenting abnormal brain waves and the doctor's conclusion that the EEG suggested plaintiff suffered from seizures, was not objective proof of disability. *Id.* at 627. Here, like *Schlegel*, there is an abnormal EEG, but that is not proof in and of itself of total disability.

Moreover, none of the additional treatment records supplied after this time provides anything other than conclusory repetitions of Plaintiff's self-reported complaints. For example, following Plaintiff's April 8, 2020 visit, Dr. Skidmore told Plaintiff to contact him if she had any more seizures prior to her next visit, but Plaintiff did not contact him. Nonetheless, on September 2, 2020, Plaintiff told Dr. Skidmore that she had had four seizures since her last visit in April with the last seizure having occurred on August 9. But this amounts to four seizures in five months—*i.e.*, it is less than the claim made by Plaintiff and Dr. Skidmore that Plaintiff experiences multiple seizures each month. Additionally, the September 2020 treatment notes indicate that Dr. Skidmore recommended neuropsychological testing "to objectively determine what her deficits are." AR 827. But the testing was never performed. Similarly, the records from the November 24, 2020 telemedicine visit with Dr. Skidmore do not contain anything other than self-reported complaints. Likewise, the final treatment record from Dr. Skidmore on July 7, 2021, contain solely Plaintiff's self reports of two focal aware seizures a month and indicate that neuropsychologist testing was still pending. These self-reports and the continued request for neuropsychological testing indicates a lack of objective proof of Total Disability from Any Occupation.

The treatment records from Dr. Grewal, a sleep specialist, similarly do not provide proof of Total Disability from Any Occupation. The first telemedicine visit with Dr. Grewal was again a recitation of Plaintiff's self-reported complaints and Dr. Grewal expressed concerns that Plaintiff's "daytime sleepiness is out of proportion to the degree of obstructive sleep apnea." AR 1148. Dr. Grewal did evaluate Plaintiff again on October 5, 2021 and reported on the results of an unattended home sleep diagnostic polysomnography for assessment of sleep apnea, with his notes indicating that the data supported "the diagnosis of *mild* obstructive sleep apnea." AR 1149 (emphasis added). However, Defendant was reasonable in not finding the diagnosis of mild obstructive sleep apnea sufficient proof of Total Disability from Any Occupation.

Notwithstanding the lack of any objective proof of Total Disability from Any Occupation from the above treatment records, on November 4, 2021, Dr. Skidmore stated in his medical opinion form that Plaintiff has two seizures per month lasting one to two minutes and taking four hours to recover. AR 920. However, there was no objective evidence in support of Dr. Skidmore's opinion, even though he repeatedly recommended that testing be completed, and therefore, Dr. Skidmore's opinion is not proof that Plaintiff is Totally Disabled from Any Occupation as of January 5, 2021.

In considering Plaintiff's appeal, Defendant also sought the opinion of an independent neurologist, Dr. Pearce, who reviewed the records and submitted a seven-page report to support his conclusion that Plaintiff was not Totally Disabled from Any Occupation. In creating his report, Dr. Pearce tried to contact Dr. Skidmore; however, Dr. Skidmore did not return multiple telephone calls. Additionally, after Dr. Pearce provided his report, Dr. Skidmore simply responded that he disagreed with Dr. Pearce's report stating: "The patient has focal epilepsy and is having seizures up to 3 times per month. Her EEG testing in the past was negative, but focal aware seizures are

often missed on scalp EEG. She does not lose awareness during the seizure but has severe post-ictal fatigue. In addition, she has cognitive symptoms which have not been fully investigated due to the Covid pandemic. Negative EEG testing does not exclude a diagnosis of epilepsy." ECF No. 23 ¶ 26. As noted in Dr. Pearce's addendum though, this response by Dr. Skidmore once again does not provide any new testing or medically relevant information. Rather it is once again a repetition of unsubstantiated self-reports and inconsistent reports at that, for although Dr. Skidmore's response claims Plaintiff has up three seizures a month, Plaintiff reported only four seizures between April 2020 and November 2020 and Dr. Skidmore had consistently noted that she has one to two seizures per month. *See* AR 825, 920. Similarly, Plaintiff's Episode Log indicated that between May 2021 and December 2021, Plaintiff had one to two "episodes" per month. AR 1076. Accordingly, Defendant did not act arbitrarily or capriciously by discrediting Dr. Skidmore's unsubstantiated opinion and relying on the opinion of Dr. Pearce.

Plaintiff argues that Defendant's lack of an independent medical examination ("IME") is unreasonable. ECF No. 21-1 at 16–18.  But "[i]t is well-settled that an administrator's decision to forego an IME and rely solely on paper reviews is not *per se* arbitrary, however, it is a factor to consider in a court's overall assessment of the reasonableness of the administrator's decision-making process." *Hocheiser I*, 2021 WL 672660, at *12 (citations omitted). Here, no physician other than Dr. Skidmore offered an opinion that Plaintiff was Totally Disabled from Any Occupation. Additionally, Dr. Skidmore's opinion was based on self-reports by Plaintiff, with no neuropsychological testing to substantiate it. As it is Plaintiff's burden to prove disability, upon a review of the file that contained no concrete proof of total disability, it was not unreasonable for Defendant to decline to conduct an independent medical examination.

Finally, Defendant's interpretation of Plaintiff's episode log and sworn declaration is not unreasonable as the episode log and the sworn declaration are self-reported claims. Defendant was reasonable in concluding these self-reported claims do not constitute proof of Total Disability of Any Occupation, particularly in light of the fact that the log shows improvement in Plaintiff's condition since her initial disability. The log reports some activity of headaches rather than seizures and, as mentioned above, in no month did Plaintiff log three seizures. AR 1076. Therefore, Defendant was reasonable in finding these documents do not prove Plaintiff is Totally Disabled from Any Occupation.

## 2.    Sedentary Work Capability

As detailed *supra*, Mr. Matthew Bolks conducted a Residual Employability Analysis in September 2020 and determined that Plaintiff "appears capable of sustained full-time sedentary work function ongoing." AR 813. Mr. Bolks ultimately concluded that Plaintiff "has transferrable skills" and identified "a representative list of occupational alternatives in light of [Plaintiff's] physical restrictions and limitations and in consideration of her educational background and vocational history." AR 814. In response, Plaintiff submitted a "Vocational Rehabilitation Assessment" by Wallace A. Stanfill wherein Mr. Stanfill concludes that Plaintiff's "medical condition and less than sedentary work tolerance, as described by her treating neurologist, make a return to work in any capacity in the foreseeable future vocationally improbable." AR 928. Moreover, Mr. Stanfill concludes that the Residual Employability Analysis performed by Mr. Bolks was "flawed in that it incorrectly identified alternative sedentary skilled to semi-skilled employment in occupations that require experience and credentials outside of [Plaintiff's] acquired skillset." *Id.*

The Court does not find that Defendant acted arbitrarily or capriciously in not giving weight to Mr. Stanfill's assessment. As described in the previous section, Defendant was not without reason to discredit Dr. Skidmore's opinion, and therefore, Defendant was similarly reasonable in discrediting a vocational report based on Dr. Skidmore's opinion. Additionally, Mr. Stanfill provides no support as to why the sedentary occupations identified by Mr. Bolks were outside Plaintiff's skillset. In fact, Mr. Stanfill indicated that as a Registered Nurse, Plaintiff would have acquired skills including the ability to "[a]pply special skills and training to attend to the needs of specific groups or individuals; [s]killful[ly] coordinat[e] eyes, hands, and fingers to handle delicate medical instruments; [r]emain calm and react appropriately to emergency situations; [and] [a]pply established recordkeeping procedures to maintain charts or similar medical records." AR 924–925. Such skills are consistent with the alternative occupations identified by Mr. Bolks. Plaintiff is clearly qualified to perform several alternative occupations, and Defendant was reasonable in concluding that Plaintiff has the functional capacity to perform sedentary level work.

### 3.    Social Security Administration's Determination

Finally, the Court notes that Plaintiff did receive a favorable disability finding from Social Security. Plaintiff argues that Defendant provided only generic, boilerplate reasoning for disagreeing with the Social Security Administration's determination which weighs in favor of finding the plan's benefits determination to be arbitrary and capricious. ECF No. 26 at 12–14. In Defendant's June 21, 2022 letter denying Plaintiff's appeal, Defendant included language stating that although it "consider[s] Social Security and other insurers' determinations, they are not binding on [Defendant's] decision as to whether or not [Plaintiff] meet[s] the definition of 'Total Disability', as set forth in [Plaintiff's] policy" and that "the receipt of SSDI benefits does not

guarantee the receipt of LTD benefits or vice versa." AR 361. The denial letter pointed out that

the Social Security Administration and Defendant had different medical evidence available for

evaluation of Plaintiff's claim. *Id.* Specifically, the letter noted that "in this situation, the Social

Security Administration ('SSA') did not have the results of [Defendant's] independent medical

review or vocational review that [Defendant] may have developed in [Plaintiff's] file." *Id.*

The language included by Defendant in its June 21, 2022 denial letter tracks the law. Case

law explains that an SSA award of social security disability "may be considered as a factor in

evaluating whether a plan administrator has acted arbitrarily and capriciously in reviewing a

plaintiff's claim," but it is well established that an award of social security disability "does not in

itself establish that an administrator's decision was arbitrary and capricious." *Connor v. Sedgwick*

*Claims Mgmt. Servs., Inc.*, 796 F. Supp. 2d 568, 585–86 (D.N.J. 2011) (internal quotation marks

and citations omitted). "The legal principles controlling the Social Security analysis differ from

those governing the ERISA analysis, and, thus, the SSA's determination of disability is not binding

on an ERISA benefit plan." *Id.* (citations omitted). As Defendant included language tracking the

language of this case law in its denial letter, Defendant did not ignore the award of social security

disability benefits.

Additionally, as explained in Defendant's Reply in Support of its Motion for Summary

Judgment, the record contains only two SSDI documents. ECF No. 30 at 12. The first is a January

6, 2020 letter notifying Plaintiff that the SSA determined she became disabled under their rules on

July 6, 2018 and is entitled to disability benefits beginning January 2019. AR 778. The second is

a March 25, 2020 letter that details the amount of the award. AR 776. Accordingly, the SSA

documents provided in the record do not contain explanations as to the decision to award benefits

nor do they detail evidence on which the SSDI decision was based. AR 776–782. Also, as SSA's

decision to award benefits occurred in January 2020, Dr. Pearce's reports and the other medical record evidence was not available to SSA when it made their decision.

Therefore, as there is no explanation as to SSA's reason for awarding benefits in the Administrative Record, and Defendant specifically mentioned the SSA's award of benefits in its denial, Defendant did not ignore the SSA's decision but adequately addressed the decision in light of the facts it had available. Accordingly, because the burden of proof to prove disability belongs to Plaintiff, Defendant's decision was not arbitrary and capricious simply because it did not find the same way SSA did.

In summary, having carefully reviewed the record, this Court concludes that Defendant did not abuse its discretion in denying Plaintiff LTD benefits. While this Court is mindful of Plaintiff's self-reported complaints, and the opinion of Plaintiff's treating physician that Plaintiff was Totally Disabled from Any Occupation, Defendant was nevertheless entitled to rely on the opinions of its reviewing physicians who gave contrary opinions. Considering in particular Plaintiff's self-reports of one to two seizures a month, the continued requests for additional testing to objectively determine the extent of Plaintiff's conditions by both her treating physician and Defendant, and the alternative sedentary occupations identified by Defendant, this Court cannot conclude that Defendant's decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Miller*, 632 F.3d at 845 (internal quotation marks omitted). To hold otherwise would require this Court to substitute its judgment for that of the Defendant, which is impermissible. *See Doroshow*, 574 F.3d at 234.

## V.    <u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 22) will be granted, and Plaintiff's Motion for Summary Judgment (ECF No. 21) will be denied. An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**